757 A.2d 118

**Inalegwu OKWA, et ux.**

v.

**Michael G. HARPER, et al.**

**No. 129, Sept. Term, 1999.**

Court of Appeals of Maryland.

July 28, 2000.

Jonathan P. Kagan (Brassel & Baldwin, P.A., on brief), Annapolis, for appellants.

Kimberly Smith Ward, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland and Karen J. Kruger and Deborah A. Donohue, Asst. Attys. Gen., on brief), Baltimore, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL JJ.

HARRELL, Judge.

On 15 June 1996, Inalegwu Okwa (Mr. Okwa) was arrested by Maryland Transportation Authority (MTA) police officers at Baltimore–Washington International airport (BWI) following a verbal dispute between Mr. Okwa and a counter attendant of British Airways, PLC (British Airways) over the validity of an airline ticket previously issued to Mr. Okwa for a British Airways flight. He was charged with assault, disorderly conduct, and resisting arrest. At his trial in the District Court of Maryland, sitting in Anne Arundel County, the Court found Mr. Okwa not guilty of all charges. Seemingly vindicated, Mr. Okwa and his wife, Margaret Westmoreland–Okwa (Appellants), filed a fifteen-count complaint in the Circuit Court for Baltimore City against British Airways, a British Airways employee, the State of Maryland, the MTA, and three MTA police officers. The causes of action stated in the complaint stem from the alleged manner in which the MTA police officers and British Airways personnel treated Mr. Okwa during his dispute with the British Airways counter staff over the plane ticket and subsequent arrest. The case was transferred, on motion of the defendants, to the Circuit Court for Anne Arundel County. Following a hearing, the Court granted the defendants' motion to dismiss or for summary judgment. Appellants filed a notice of appeal with the Court of Special Appeals. Before that court considered the case, we issued a writ of certiorari on our own initiative.

*Okwa v. Harper,* 357 Md. 233, 743 A.2d 245 (2000). Appellants focus their appeal solely on the Circuit Court's judgment as to the motions of the three MTA police officers (Appellees).

## I. BACKGROUND

Mr. Okwa arrived at the British Airways ticket counter at BWI on 15 June 1996 at 5:30 p.m. His purpose was to check-in for a flight to Lagos, Nigeria, scheduled to depart at 6:45 p.m. Mr. Okwa had paid $2,353 for his ticket.[1] When he walked up to the counter and offered his ticket, Ms. Maria Spriggs and another British Airways employee informed him that his ticket was invalid for travel on that particular flight to Nigeria. Mr. Okwa inquired as to why they would not accept his ticket. Ms. Spriggs did not answer his question; instead she recommended that he take up his ticket dispute with his travel agent. Mr. Okwa renewed his request for an explanation regarding the problem with his ticket. Without further explanation, Ms. Spriggs asked Mr. Okwa to pick up his baggage and leave the check-in area. At least two MTA police officers, Michael G. Harper (Harper) and Kimberly Potter (Potter), were in the same area of the airport terminal where Mr. Okwa's ticket dispute was evolving. They ap-

---

1. Apparently, although not stated clearly in the record, Mr. Okwa purchased his ticket through R.A. Travel, Inc., an airline ticket reseller. In an affidavit submitted by Mr. Okwa, he stated that he was originally scheduled for a flight departing on 4 March 1996, but later determined he would be unable to fly on that date. He called his travel agent to cancel his reservation and to reschedule his flight for 15 June 1996. At least two weeks before his rescheduled flight, he called British Airways to confirm his reservation and reconfirmed in-person at a British Airways office in Washington, DC, sometime during the week before 15 June 1996. On both occasions when Mr. Okwa confirmed his new reservation, he maintained that he was advised by British Airways personnel that there were no problems with his reservation.

Contrary to Mr. Okwa's explanation, Ms. Spriggs testified at Mr. Okwa's criminal trial, that on 15 June 1996, as she was beginning to check Mr. Okwa in for his flight, she noticed in British Airways's computer system that Mr. Okwa previously was advised to return his ticket to his travel agent because British Airways had ceased doing business with Mr. Okwa's travel agent and his ticket had expired.

During Mr. Okwa's criminal trial, the State stipulated the Mr. Okwa had a valid ticket for travel on 15 June 1996.

proached the check-in counter and were informed by Ms. Spriggs that Mr. Okwa was "causing trouble."[2]

At this point, the parties, in their pleadings and papers submitted to the Circuit Court, offer conflicting accounts of what happened next. The affidavits of Officers Harper and Potter stated that the officers approached Mr. Okwa and asked him to calm down, but Mr. Okwa "continued to get more agitated." Officer Potter reportedly told Mr. Okwa "to cease and desist his unlawful activities and explained that he could not stand in a public facility and scream and holler or else I would have to arrest him for disorderly conduct." According to the officers, Mr. Okwa thereupon demanded that they arrest him and he offered his hands to be handcuffed. The officers asserted they complied with his request. They handcuffed Mr. Okwa and guided him toward a terminal exit. The third Appellee, Officer William H. Gernert,[3] arrived on the scene at this point and assisted his fellow officers in removing Mr. Okwa. When the group exited the terminal, the officers explained that Mr. Okwa "started jumping up and down trying to break free and yelling at us to shoot him." In an attempt to restrain Mr. Okwa, Officer Potter stated that she grabbed his hands, but Mr. Okwa twisted his arms and trapped Officer Potter's hands in the handcuffs. The whole group then fell to the ground. The officers restrained Mr. Okwa on the ground until additional officers arrived on the scene. When a patrol car arrived on the scene, Mr. Okwa calmed down and ceased to struggle. Officer Harper placed Mr. Okwa into the car and he was taken to the Anne Arundel County Detention Center. Officer Potter was taken to a hospital for treatment of injuries suffered in the scuffle and fall.

In an affidavit[4] offered by Mr. Okwa, he presented a different version of the events leading up to his incarceration,

---

**2.** It is unclear whether the officers were attracted to the scene by overhearing the dispute or were summonsed by British Airways personnel.

**3.** Appellees note in their brief that Officer Gernert passed away during the pendency of this appeal.

**4.** Although titled as an "affidavit," the three page, 18 March 1999 paper signed by Mr. Okwa failed to contain the usual prerequisites for an

■■■■■■■■

According to Mr. Okwa, without inquiring about the nature of his ticket dispute with the British Airways personnel, Officers Harper and Potter prematurely demanded that he leave the airport terminal. Mr. Okwa explained to the officers that he had a valid ticket and wished to board the flight. Without further warnings or discussion, the officers then handcuffed him and began to drag him away from the ticket counter, at which point they were joined by Officer Gernert and a police search dog. When the group exited the terminal, Mr. Okwa asserted that he was forced to the ground, struck in the head by either Officer Harper or Gernert, and had his cuffed hands twisted by his thumbs by Officer Potter. As a result of the

affidavit. Appellees have asserted before this Court that Mr. Okwa's "affidavit" should not be considered in our analysis of whether a genuine dispute of a material fact was generated because there is no indication in the document that Mr. Okwa's statements were made under oath or affirmation, or that they were made based on his personal knowledge. Mr. Okwa's affidavit is lacking in both regards, although it states he is competent to testify as an adult. Ordinarily such faults would justify disregarding such a purported affidavit (*see* Md. Rule 2–501(c)); however, we shall not countenance Appellees raising this issue for the first time on appeal. The scope of matters we will decide on appeal is quite clear. Maryland Rule 8–131(a) states " . . . the appellate court will not decide any other issue [subject matter jurisdiction aside] unless it plainly appears by the record to have been raised in or decided by the trial court." Appellees were aware of Mr. Okwa's "affidavit" prior to the motions hearing in the Circuit Court and had ample opportunity to review it before the hearing. For whatever reason, Appellees did not point out to the Circuit Court the correctable flaws in the form of the affidavit they raise here. By proceeding in this manner, they have waived this issue for purposes of appeal. *See Outmezguine v. State*, 335 Md. 20, 51–52, 641 A.2d 870, 886 (1994); *Wyand v. Patterson Agency, Inc.*, 266 Md. 456, 460–61, 295 A.2d 773, 776 (1972)("non-compliance in the affidavit with the rule's requirements as to form cannot be raised for the first time on appeal"); *Fishman Const. Co. v. Hansen*, 238 Md. 418, 424, 209 A.2d 605, 608 (1965)(question regarding the sufficiency of parties affidavit may not be presented for the first time on appeal). Moreover, the motions judge did not state, as he had the ability to do even in the absence of Appellees' objections, that he was disregarding Mr. Okwa's "affidavit" as part of the record before him in ruling on the motion. Having not excluded expressly from consideration Mr. Okwa's "affidavit," the Circuit Court is deemed by us, for appellate review, to have considered it in reaching its pertinent ruling. *See* Md. Rule 2–322(c).

incident, Mr. Okwa suffered injuries to his head, neck, knees, and arms. At the time of the ticket dispute and his arrest, Mr. Okwa stated that he was the only person in the immediate area of the terminal where the British Airways counter was located, except for the police officers and British Airways personnel. He acknowledged that he raised his voice during the ticket dispute, but claimed that he never screamed or yelled at the officers or Ms. Spriggs. Mr. Okwa concluded his affidavit stating that he did not resist or provoke the officers and that it was his belief "that the actions by Gernert, Harper, and Potter were motivated by the fact that I was a black male and were taken with the intended purpose to injure me."

Mr. Okwa was charged with disorderly conduct in a public place, resisting arrest, and assault. His District Court trial was held 1 May 1997. The State presented five witnesses, including Ms. Spriggs and Officers Potter and Gernert. After the State presented its case, defense counsel for Mr. Okwa decided not to call any witnesses because he believed that the State had failed to meet its burden. The trial judge agreed. He found that there were too many contradictions in the testimony given by the State's witnesses to warrant a conviction and therefore found Mr. Okwa not guilty of all charges.[5]

On 5 March 1998, Appellants filed a complaint seeking damages in the Circuit Court for Baltimore City. On 7 April 1998, Officers Harper and Potter, the MTA, and the State of Maryland filed a motion to dismiss for improper venue. On 17 June 1998, the Court denied the motion to dismiss, but

---

5. Some of the more obvious contradictions to which the trial judge may have referred involved the conflicting testimony of the witnesses regarding the point in time when Mr. Okwa was placed under arrest and whether Mr. Okwa caused a crowd to gather around the British Airways ticket counter. British Airways personnel, including Ms. Spriggs, testified that the only people in the area during the ticket dispute were the officers and three ticket agents. Officer Potter and Gernert testified that a crowd had gathered around the ticket counter. Officer Gernert also testified that Mr. Okwa was placed under arrest and handcuffed outside of the airport terminal. The other witnesses testified that he was handcuffed at the ticket counter. The transcript of the District Court trial was before the Circuit Court for consideration at the motions hearing in the civil suit.

ordered the case transferred to the Circuit Court for Anne Arundel County.[6] *See* Md. Rule 2–327(b).

Appellants filed an amended complaint in the Circuit Court for Anne Arundel County on 20 January 1999. In the amended complaint, Appellants asserted against all the defendants the common law torts of false imprisonment, malicious prosecution, intentional infliction of emotional distress, as well as violations of 42 U.S.C. § 1985 and 42 U.S.C. § 1981. Each count sought compensatory and punitive damages against Officers Harper, Potter, and Gernert, the MTA, and the State of Maryland.[7] Additionally, Appellants included a common law battery count and counts charging violations of 42 U.S.C. § 1983 and Article 24 of the Maryland Declaration of Rights, seeking compensatory and punitive damages, against Officers Harper, Potter, and Gernert, the MTA, and the State of Maryland. Finally, Appellants added a loss of consortium claim against all of the defendants.

On 18 February 1999, Officers Harper and Potter, the MTA, and the State of Maryland filed an amended motion to dismiss, or alternatively motion for summary judgment. The affidavits of Officers Harper and Potter were attached to the motion. On that same day, Officer Gernert filed a motion to dismiss, supporting memorandum of law, and his affidavit. On 18 February 1999, British Airways and Ms. Spriggs filed a motion to dismiss the first amended complaint. Appellants filed, on 25 March 1999, separate memoranda in opposition to all the defense motions and Mr. Okwa's affidavit.

---

**6.** On 24 April 1998, while the Circuit Court was considering the motion to dismiss for improper venue, British Airways and Ms. Spriggs filed a notice of removal to the United States District Court for the District of Maryland. They also filed their answer to Appellants' complaint in the federal court on 5 May 1998. On 21 May 1998, Judge Andre M. Davis remanded the case back to the Circuit Court for Baltimore City. Apparently, having not yet received notice of the federal court's remand order, Officer Gernert filed in the federal court on 26 May 1998 his answer to Appellants' complaint.

**7.** British Airways and Ms. Spriggs were also included in the claim for punitive damages under the 42 U.S.C. § 1985 count.

A hearing was held in the Circuit Court for Anne Arundel County, on 14 June 1999, to address all pre-trial motions filed by the parties. At the hearing, the Court treated British Airways's and Ms. Spriggs's motion to dismiss as a motion for summary judgment and granted the motion at the hearing. The Court signed an order granting summary judgment to those defendants on 1 July 1999. In similar fashion, the Court orally granted the motion to dismiss, or alternatively motion for summary judgment, filed by the MTA, and the State. It then signed the order granting their motion on 6 July 1999. The Court at the 14 June hearing reserved its ruling on the motions filed on behalf of Officers Harper, Potter, and Gernert.

Ultimately, the Court granted motions to dismiss or, in the alternative, motions for summary judgment in favor of Officers Harper, Potter, and Gernert.[8] In an extensive footnote to each order regarding the officer's motions, the Court made certain findings pertinent to the present appeal. The Court explained:

a.) Count I & II Battery & Punitive Damages: Plaintiffs fail to state a claim upon which relief may be granted as against these Defendants. The court finds that Defendants were acting in accordance with their duties of employment and as such are immune from suit.... Furthermore, the requisite finding of malice against Plaintiffs does not exist to remove the bar of immunity in the present suit....

b.) Count III & IV False Arrest & False Imprisonment: This count too is barred by the grant of immunity.... Further, these counts fail to establish a claim upon which relief can be granted in that False Arrest & False Imprisonment require an arrest or confinement without legal authority or probable cause.... As a result of Plaintiff Okwa's independent actions, the officers had adequate probable cause to cause an arrest and imprisonment.

---

**8.** The Court's order as to Officer Gernert's motion was docketed on 1 July 1999 and its order as to Officers Harper and Potter was docketed on 6 July 1999.

c.) Count V & VI Malicious Prosecution: In addition to the immunity of the Defendants, this Court finds that there are not adequate grounds to support a cause of action for Malicious Prosecution as to these Defendants. . . .

\* \* \* \* \*

d.) Counts IX & X 42 U.S.C. Section 1983 Violation of Civil Rights: Defendants in this case enjoy the privilege of immunity and did not act with malice to lift the bar of such immunity. Further, Plaintiffs fail to allege facts sufficient to lift the bar of immunity in that they have not proved that Plaintiffs were deprived of a right or privilege secured by the Constitution. As a result Plaintiffs cannot maintain an action against Harper, Potter, or Gernert. . . .

\* \* \* \* \*

h.) Counts XVII & XVIII Violation of the Maryland Declaration of Rights and Punitive Damages: Plaintiffs seek remedies to which they cannot establish a basis for. Defendants in this case were acting within the scope of their employment, and arrested and detained Plaintiff Okwa in accordance with the Constitution. . . . Plaintiff Okwa fails to state a claim which would permit this Court to grant a remedy.

i.) Count[s] XIX & XX Loss of Consortium: This tort is derivative in nature, and therefore it too fails to demonstrate compensable harm on the part of the Plaintiffs. . . .

On 27 July 1999, Appellants appealed to the Court of Special Appeals. Before the intermediate appellate court considered the appeal, we granted a writ of certiorari on our own initiative to consider whether the Circuit Court erred in granting summary judgment to Officers Harper, Potter, and Gernert (Appellees) on the common-law, constitutional, and loss of consortium claims asserted by Appellants.[9] The specific questions presented to the Court are:

---

**9.** Appellants do not appeal the lower court's orders regarding British Airways, Ms. Spriggs, the MTA and the State. Appellants also do not

I. Whether the lower court erred in granting appellee police officers' motion for summary judgment on the claims for battery, false arrest, and malicious prosecution, because genuine issues of material fact existed on the issue of malice.

II. Whether the lower court erred in granting appellee police officers' motion for summary judgment on the state and federal constitutional claims for excessive force when genuine issues of material fact existed on the issue of "objective reasonableness."

## II. STANDARD OF REVIEW

The Circuit Court's pertinent orders state "that the Defendant's Motion to Dismiss or, in the Alternative for Summary Judgment [as] to [ ] [the] First Amended Complaint be, and is hereby GRANTED." Although the Circuit Court did not explain whether it was granting Appellees' motions to dismiss or motions for summary judgment, we shall treat the orders as granting summary judgment. Pursuant to Maryland Rule 2–322(c), when a trial judge is presented with factual allegations beyond those contained in the complaint to support or oppose a motion to dismiss and the trial judge does not exclude such matters, then the motion shall be treated as one for summary judgment. *See also Green v. H & R Block*, 355 Md. 488, 501, 735 A.2d 1039, 1047 (1999); *Fairfax Savings v. Kris Jen Ltd. Partnership*, 338 Md. 1, 9–10, 655 A.2d 1265, 1269 (1995). In the present case, the parties offered dueling affidavits that included allegations beyond those in the complaint. The trial judge did not expressly exclude the parties' affidavits and, at the motions hearing, appears to have referred to language found in Mr. Okwa's affidavit. Thus, we will review the Circuit Court's orders under our summary judgment jurisprudence.

---

pursue an appeal of the lower court's orders disposing of the claims for intentional infliction of emotional distress, and violations of 42 U.S.C. § 1981 and 42 U.S.C. § 1985 against the Appellees.

 A summary judgment motion is not a substitute for trial. Rather it is used to dispose of cases when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Md. Rule 2–501(e); *Ungar v. Handelsman,* 325 Md. 135, 146–47, 599 A.2d 1159, 1164 (1992). The standard for appellate review of a trial court's grant of summary judgment is whether the trial judge was legally correct in his or her rulings. *See Sheets v. Brethren Mut. Ins. Co.* 342 Md. 634, 638–39, 679 A.2d 540, 542 (1996); *Heat & Power v. Air Prod.,* 320 Md. 584, 592, 578 A.2d 1202, 1206 (1990). In granting a motion for summary judgment, the trial judge may not resolve factual disputes, but instead is limited to ruling on matters of law. *See Pittman v. Atlantic Realty Co.,* 359 Md. 513, 537, 754 A.2d 1030, 1042–43 (2000); *Sheets,* 342 Md. at 638, 679 A.2d at 542. Summary judgment is generally inappropriate when matters such as knowledge, intent, and motive are at issue. *See Brown v. Dermer,* 357 Md. 344, 355, 744 A.2d 47, 53 (2000). If any inferences may be drawn from the well-plead facts, the trial court must construe those inferences in the light most favorable to the non-moving party. *See Ashton v. Brown,* 339 Md. 70, 79, 660 A.2d 447, 452 (1995). The existence of a dispute as to some non-material fact will not defeat an otherwise properly supported motion for summary judgment, but if there is evidence upon which the jury could reasonably find for the non-moving party or material facts in dispute, the grant of summary judgment is improper. *See Beatty v. Trailmaster, Inc.,* 330 Md. 726, 738, 625 A.2d 1005, 1011 (1993).

## III. COMMON–LAW TORT CLAIMS

Appellees argue for affirmance because Appellants failed to establish that Appellees acted with malice when they arrested Mr. Okwa, thus failing to overcome the immunity from certain tort suits enjoyed by state personnel. Appellees further urge they had adequate legal justification and probable cause to arrest Mr. Okwa based on his conduct at BWI.

## A.

The Circuit Court concluded that Appellees' were entitled to summary judgment on Appellants' battery count because the Appellees "were acting in accordance with their duties of employment . . . [and] the requisite finding of malice [motivating their conduct] against [Mr. Okwa] does not exist to remove the bar of immunity in the present suit." The immunity referred to by the trial court is that provided to state personnel under the Maryland Tort Claims Act (MTCA). Maryland Code (1984, 1999 Repl.Vol.), State Government, § 12–105 provides that "State personnel shall have the immunity from liability described under § 5–552(b) of the Courts and Judicial Proceedings Article." Maryland Code (1973, 1998 Repl.Vol.), Courts & Judicial Proceedings, § 5–522(b) in turn states, in pertinent part:

> State personnel, as defined in § 12–101 of the State Government Article, are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence.

Section 12–101(a)(2)(i) defines employees of the Maryland Transportation Authority as "State Personnel." It is undisputed that Appellees were police officers employed by the Maryland Transportation Authority and Appellants concede that Appellees were acting within the scope of their public duties during their confrontation with Mr. Okwa. As Appellants do not argue that Appellees acted with gross negligence, the sole issue as to the battery count is whether the Circuit Court concluded correctly that there existed no triable issue as to whether Appellees acted with malice when they arrested and restrained Mr. Okwa. This Court has addressed the issue of defining malice under the MTCA. Recently in *Shoemaker v. Smith*, 353 Md. 143, 725 A.2d 549 (1999), we clarified the standard of malice under CJP § 5–522(b). *Shoemaker* involved two St. Mary's County sheriff's deputies sued by a family following the deputies' temporary detention of the family's children.[10] The deputies sought summary judgment,

---

10. The deputies took custody of the children because there were allegations that they may have been in danger of abusive treatment by their father.

arguing they were immune from suit under the MTCA. The Circuit Court denied the motion.

Before this Court, the deputies asserted they were entitled to summary judgment based on the doctrine of collateral estoppel because, in a related federal case where the family had asserted a 42 U.S.C. § 1983 claim against the deputies, a United States District Judge found that the deputies did not use excessive or unreasonable force. *See Shoemaker*, 353 Md. at 158, 725 A.2d at 557. Following a review of the evolution of the grounds for immunity from a 42 U.S.C. § 1983 claim, we rejected the deputies' argument, holding that substantial distinctions existed between 42 U.S.C. § 1983 immunity and immunity under the MTCA. We noted that malice had been eliminated effectively as a ground that would trump immunity in a § 1983 context, but that the absence of malice was a legislatively mandated element for immunity under the MTCA and CJP § 5–522(b). We explained that:

> [t]he question raised for purposes of immunity under the State Tort Claims Act is whether a jury could reasonably find that [the deputies] conduct, given all of the existing and antecedent circumstances, was motivated by ill will, by an improper motive, or by an affirmative intent to injure the boys ... that motive or animus may exist even when the conduct is objectively reasonable. If it does, there is no immunity under the State Tort Claims Act.

*Id.* at 164, 725 A.2d at 560.

In an earlier case, *Sawyer v. Humphries*, 322 Md. 247, 587 A.2d 467 (1991), we similarly described the element of malice for purposes of the MTCA. The defendant in *Sawyer*, a state police officer, was alleged to have committed numerous intentional torts, including battery. The plaintiffs claimed that the officer, while off-duty, threw rocks at their car and attacked one of the occupants of the car. The Court of Special Appeals affirmed the trial court's judgment dismissing the case, holding that the officer was immune from the suit under the MTCA. As one basis for our reversal of the Court of Special Appeals, we held the plaintiffs had alleged sufficiently, to

overcome the motion to dismiss, that the officer's actions were malicious. In clarifying the meaning of the term "malice," we stated:

> [w]hen someone, without provocation or cause, throws rocks at two other persons, he is obviously demonstrating ill will towards those persons. Wrestling another to the ground, pulling his hair, and hitting him on the face, again without cause or provocation, is certainly malicious conduct.

*Sawyer*, 322 Md. at 261, 587 A.2d at 474.

■ Our review of the record in the present case, in particular the affidavits submitted by Mr. Okwa and Appellees, reveals two diametrically opposed versions of the circumstances surrounding Mr. Okwa's arrest. According to the Appellees' affidavits collectively, as the three officers were escorting Mr. Okwa toward the terminal exit, he started "jerking from side to side" and began to "kick his feet." After the group "calmly exited" the terminal, Mr. Okwa "started jumping" and Appellees merely "tried to control him by his handcuffs." Mr. Okwa continued to struggle and the group "fell to the ground" while Officer Harper "tried to break Mr. Okwa's fall as he would not be able to catch himself." Mr. Okwa was still "fighting" as Appellees held him to the ground.

Mr. Okwa, however, offered a different view of the incident. He explained in his affidavit that, after he was handcuffed, Appellees "roughly dragged" him toward the exit. When the group emerged outside of the terminal, he "was forcibly put to the ground." Although "at no time did [he] resist or provoke the officers," Mr. Okwa was struck "in the head and neck" and "his cuffed hands [were twisted] by his thumbs." As a result of the incident, Mr. Okwa "suffered injuries to [his] head, neck, knees, wrists, and arms."

■ Based on Appellees' version of the story, a fact finder, if given the opportunity, could conclude that Appellees acted without malice and did not commit the act of battery while arresting Mr. Okwa. The fact finder could find that any injuries suffered by Mr. Okwa were the product of his own resistive and combative efforts. Apparently this is the version

of events that the trial judge opted to believe. The trial judge necessarily determined Appellees' accounts of the alteration to be more credible and based his ruling on them. This was an error. The summary judgment process is not properly an opportunity for the trial court to give credence to certain facts and refuse to credit others. *See Pittman v. Atlantic Realty Co.*, 359 Md. 513, 537, 754 A.2d 1030, 1042–43 (2000) (citations omitted)(the trial judge is not permitted to weigh evidence in deciding a motion for summary judgment); *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. at 638, 679 A.2d at 542 ("[i]n granting a motion for summary judgment, the trial court does not resolve factual disputes, but instead is limited to ruling as a matter of law"); *Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 345, 658 A.2d 675, 677 (1995)("the trial court does not determine facts, but instead rules on the motion [for summary judgment] as a matter of law").

If a fact finder believed Mr. Okwa's rendition of the incident, however, it could infer reasonably that Appellees were motivated by an improper motive or that they had an affirmative intent to bring harm to Mr. Okwa. *See Shoemaker*, 353 Md. at 164, 725 A.2d at 560. It would not be unreasonable for a fact finder to infer that Appellees were motivated by an extreme and overzealous desire to punish Mr. Okwa for failing to obey immediately their instructions to walk away from the ticket counter and exit the terminal. The alleged fact, if believed, that peace officers beat a citizen about his head and neck while they twisted his thumbs, could support an inference that Appellees were inspired with malicious intention. Such behavior fits the type of conduct which would strip the actor's immunity otherwise provided under the MTCA. *See Shoemaker*, 353 Md. at 164, 725 A.2d at 560. Because disputed material facts exist in the record, or inferences of malicious conduct may be drawn from Mr. Okwa's version of the facts, the battery counts were not amenable to disposition via summary judgment.

## B.

The Circuit Court granted Appellees' motion for summary judgment, as to the malicious prosecution counts, be-

cause "there are not adequate grounds to support a cause of action for Malicious Prosecution as to these [Appellees]." [11] For the reasons explained below, we hold that the trial judge erred in reaching this conclusion.

A plaintiff must show the following to establish the tort of malicious prosecution:

1) the defendant instituted a criminal proceeding against the plaintiff;

2) the criminal proceeding was resolved in the plaintiff's favor;

3) the defendant did not have probable cause to institute the proceeding; and

4) the defendant acted with malice or a primary purpose other then bringing the plaintiff to justice.

*See DiPino v. Davis*, 354 Md. 18, 54, 729 A.2d 354, 373 (1999); *One Thousand Fleet Ltd. Partnership v. Guerriero*, 346 Md. 29, 37, 694 A.2d 952, 956 (1997); *Krashes v. White*, 275 Md. 549, 554, 341 A.2d 798, 801 (1975). Appellees do not contest that following Mr. Okwa's arrest by Appellees, he was charged with disorderly conduct, resisting arrest, and assault. It is also uncontested that Mr. Okwa was found not guilty of these charges by the District Court. Thus, facts have been plead that, if proven, satisfy elements 1) and 2) of the tort. It is necessary for us to consider whether there are a triable issues as to whether Appellees had probable cause to arrest Mr. Okwa and whether they acted with malice when they did so.

Probable cause, as the term suggests, is a concept based on probability. *See State v. Ward*, 350 Md. 372, 396, 712 A.2d 534, 545–46 (1998)(quoting *Illinois v. Gates*, 462 U.S.

---

**11.** The Circuit Court also found that the malicious prosecution counts and the "False Arrest/False Imprisonment" counts were barred by the grant of immunity under CJP § 5–522(b). For the reasons we explained in part III. A. of this opinion, we also hold that a fact-finder could draw a reasonable inference from Appellants' facts that Appellees acted with the requisite degree of ill-will or improper motive to trump the immunity conferred by the MTCA. *See Shoemaker*, 353 Md. at 164, 725 A.2d at 560.

213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527, 544 (1983)). It does not have a technical definition. Rather, the question of whether a law enforcement officer had probable cause to make a particular arrest is determined on "factual and practical considerations of everyday life on which reasonable and prudent [people] . . . act." *Id.* We have defined probable cause as " 'facts and circumstances sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense.' " *DiPino,* 354 Md. at 32, 729 A.2d at 361 (citations omitted)(alterations in original). In *DiPino,* we instructed that:

> [t]o determine whether an officer had probable cause, under that conception, the reviewing court necessarily must relate the information known to the officer to the elements of the offense that the officer believed was being or had been committed. The officer, of course, must undertake the same analysis in determining, in the first instance, whether the person may lawfully be arrested.

*Id.*

Appellees initially arrested Mr. Okwa for disorderly conduct. Therefore, it is necessary for us first to consider the nature of that offense. Disorderly conduct in public places is a statutory crime with common law roots. It is presently codified in Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 123. The statute provides, in pertinent part:

> A person may not act in a disorderly manner to the disturbance of the public peace, upon any public street, highway, alley, park or parking lot, in any city, town, or county in this State, or at any place of public worship, or public resort or amusement in any city, town or county in this State, or in any store during business hours, or in any elevator, lobby or corridor of any office building or apartment house having more than three separate dwelling units, or in any public building in any city, town or county of this State.

We have interpreted the statute to prohibit "the doing or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same

area." *See Dennis v. State*, 342 Md. 196, 201, 674 A.2d 928, 930 (1996), *vacated on other grounds and remanded*, 519 U.S. 802, 117 S.Ct. 40, 136 L.Ed.2d 4 (1996), *affirmed on remand*, 345 Md. 649, 693 A.2d 1150 (1997).

 Appellees correctly asserted at oral argument that there is a police command aspect to the crime of disorderly conduct. *See Dennis*, 342 Md. at 201, 674 A.2d at 930. When a citizen disobeys a reasonable and lawful request by a police officer "fairly made to prevent a disturbance to the public peace" that citizen has engaged in disorderly conduct. *See Harris v. State*, 237 Md. 299, 303, 206 A.2d 254, 256 (1965). *See also Baynard v. State*, 318 Md. 531, 538, 569 A.2d 652, 655 (1990)(under some circumstances, it is a violation to disobey a police officer's request to leave an area). The police officer's request, however, must be intended to prevent someone from inciting or offending others. It may not be an arbitrary directive. *See Dennis*, 342 Md. at 201, 674 A.2d at 930. In *Dennis*, we held that a passenger's failure to remain in a car after he was commanded to do so did not pose a sufficient danger of breaching the peace in order to sustain a disorderly conduct conviction. *See id.* at 203, 674 A.2d at 931. *But see Barnhard v. State*, 325 Md. 602, 616, 602 A.2d 701, 708 (1992)(evidence that a defendant taunted police with obscenities, threatened to kill another officer, and incited a crowd was sufficient to give police probable cause to make an arrest for disorderly conduct).

In *Briggs v. State*, 90 Md.App. 60, 599 A.2d 1221 (1992), the Court of Special Appeals affirmed a disorderly conduct conviction on somewhat analogous facts to those alleged by Appellees in the present case. During a carnival in Caroline County, the defendant became agitated after he lost a sum of money at a gambling table. He began cursing in a loud voice, violently throwing dice at the table, and grabbing for his lost money. Despite efforts to calm him down, the defendant continued his behavior, the police were summoned and eventually arrested him. During the arrest, the defendant swung his arms around and struck the police officers. A large crowd gathered during the struggle.

After his conviction for disorderly conduct, the defendant appealed to the Court of Special Appeals challenging the sufficiency of the evidence supporting his conviction. The court undertook a chronological analysis, viewing the defendant's conduct in separate episodes, first at the gambling table and then during the fight with the police. It ultimately held that the defendant's behavior in either time frame was sufficient to support a disorderly conduct conviction. Focusing on his behavior at the table, the court stated:

> [the defendant] shouted, grabbed back the money he lost, and slammed the dice into the table. The carnival was crowded, and some of the patrons were noticeably affected by this: people complained to the firemen, asking them to do something to induce [the defendant] to desist. So extreme was [the defendant's] behavior that the firemen operating the dicing game were moved to seek police assistance in persuading him to leave after their own attempts to discourage his disruptive behavior were unsuccessful. This alone would be sufficient to invoke the statute's sanctions.

*Briggs*, 90 Md.App. at 69, 599 A.2d at 1225. Turning to the point in time when the defendant was arrested, the court explained:

> his response to their order constituted disorderly conduct: in addition to physically resisting their efforts to take him into custody, he threatened them, and incited the crowd sufficiently to cause the officers to fear that the crowd would 'take him away' from them .... we conclude that a rational jury reasonably could have concluded that [the defendant] was guilty of disorderly conduct. [The defendant's] actions at every turn disrupted the carnival, challenged the police, and eventually incited the crowd against the officers. This behavior reasonably prompted the officers to arrest him for disorderly conduct.

*Id.* at 73, 599 A.2d at 1227.

Against this backdrop, Appellees contend that they acted properly when they arrested Mr. Okwa for disorderly conduct. They point out that he engaged in the type of conduct

prohibited by the statute by "waiving his hands in the air, yelling, repeatedly refusing to obey Officer Potter's orders to cease and desist this activity in the Airport," and that "a reasonable person observing Mr. Okwa's conduct could believe that Mr. Okwa committed the offense of disorderly conduct."

This may be a persuasive argument when made to a fact-finder, but it will not carry the day in our review of the grant of summary judgment in this case. Implicit in the Circuit Court's grant of summary judgment is a finding of the facts, viewed in the light most favorable to Appellants, supporting the conclusion, as a matter of law, that Appellees had probable cause to arrest Mr. Okwa. *See* Md. Rule 2–501(a); *Baltimore Gas and Elec. Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307, 311 (1995); *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 62, 485 A.2d 663, 671 (1984). That was an error.

Examining the factual record before the Circuit Court, under the correct standard, it suggests that Mr. Okwa paid over $2000 for a plane ticket to Nigeria and confirmed his reservation twice before the flight. On both confirmation efforts, airline personnel advised him that there were no problems with his reservation. As he attempted to check-in on the day of the fight, airline personnel refused to accept his ticket or explain their refusal. Rather, he was informed to take up his dispute with his travel agent. His flight was about to depart and he raised his voice, understandably, in frustration. The police approached and, without inquiring into the situation, told him to leave the area. According to Mr. Okwa's version of the event, only he, Appellees, and British Airways personnel were in the immediate vicinity of the dispute. Mr. Okwa stated that he wanted to know why he could not board his flight and the police immediately arrested him.

If Mr. Okwa's factual allegations are believed ultimately, Officers Potter and Harper did not have probable cause to arrest Mr. Okwa.[12] Maryland Code (1957, 1996 Repl.Vol.),

12. Officer Gernert asserts in Appellees' brief that he was not present during the arrest of Mr. Okwa and that he did not initiate criminal

Article 27, § 123 is directed at deterring more severe conduct than that engaged in by Mr. Okwa by his account. From the facts alleged by Appellants, a reasonable person might not believe Mr. Okwa's behavior could have offended, disturbed, or incited a group of surrounding people. *See Dennis,* 342 Md. at 201, 674 A.2d at 930. Mr. Okwa simply was attempting to settle a facially legitimate dispute over a commercial transaction. On the record before us, we cannot say, as a matter of law, that Mr. Okwa's conduct created any real danger of breaching the peace as a matter of law. *See* Md. Rule 2–501(a); *Green v. H & R Block, Inc.,* 355 Md. 488, 501, 735 A.2d 1039, 1047 (1999).

We also shall consider briefly the question of whether, on this record and as a matter of law, Appellees lacked "malice, or a primary purpose in instituting the proceeding other than that of bringing the offender to justice." *See Krashes,* 275 Md. at 554, 341 A.2d at 801. This Court has long held that "the 'malice' element of malicious prosecution may be inferred from a lack of probable cause." *Montgomery Ward v. Wilson,* 339 Md. 701, 717, 664 A.2d 916, 924 (1995). *See DiPino,* 354 Md. at 55, 729 A.2d at 374; *Exxon Corp. v. Kelly,* 281 Md. 689, 699–700, 381 A.2d 1146, 1152–53 (1978); *Jannenga v. Libernini,* 222 Md. 469, 474, 160 A.2d 795, 798 (1960). Because we have determined that Appellees may not have had probable cause to arrest Mr. Okwa, further analysis of this element is unnecessary.

 We note one final matter regarding Appellants' malicious prosecution claims. Appellants have alleged in their first amended complaint that they are entitled to punitive damages based on the actual malice which allegedly motivated

---

. charges against Mr. Okwa. Based on these assertions, Officer Gernert claims that he is not liable for Appellants' malicious prosecution and false arrest/imprisonment counts. Officer Gernert, however, overlooks his own testimony at Mr. Okwa's criminal trial wherein he stated that he and the other Appellees handcuffed Mr. Okwa and told him that he was arrested after he was removed from the airport terminal. Officer Gernert's testimony clearly creates a material dispute of fact as to whether he was present when Mr. Okwa was arrested.

Appellees. Although an inference of malice based on a lack of probable cause is sufficient to support an award of compensatory damages, in order to receive a punitive damage award Appellants must prove at trial that Appellees were moved by actual malice. This showing may not be made inferentially. *See DiPino,* 354 Md. at 55–56, 729 A.2d at 374; *Montgomery Ward,* 339 Md. at 735–36, 664 A.2d at 933. In *Montgomery Ward,* we recognized that:

> for punitive damages to be allowable in malicious prosecution actions, a plaintiff must establish by clear and convincing evidence the defendant's wrongful or improper motive for instigating the prosecution. Although the jury may draw an inference of such motive from lack of probable cause for purposes of compensatory damages, it may not rely on the inference in considering punitive damages.

*Montgomery Ward,* 339 Md. at 735–36, 664 A.2d at 933. We command a higher standard in this context because, in certain situations, police officers or an individual may lack probable cause to institute a criminal proceeding because they have acted negligently. An inference of malice, resulting from a negligent action, rather than one motived by true ill-will, cannot justify an award of punitive damages. *See id.* at 735, 664 A.2d at 933.

## C.

Turning to Appellants' false arrest and false imprisonment claims, the Circuit Court awarded summary judgment to Appellees based on its finding that "these counts fail to establish a claim upon which relief can be granted in that False Arrest & False Imprisonment require an arrest or confinement without legal authority or probable cause.... As a result of Plaintiff Okwa's independent actions, the officers had adequate probable cause to cause an arrest and imprisonment." The Circuit Court erred.

In Appellants' first amended complaint they framed one count designated as "False Arrest / Imprisonment." Although the intentional torts of false arrest and false imprison-

ment are separate causes of action, they share the same elements. *See generally Scott v. Jenkins,* 345 Md. 21, 29, 690 A.2d 1000, 1003 (1997); *Montgomery Ward,* 339 Md. at 721, 664 A.2d at 926. We shall discuss the torts concurrently.

For a successful cause of action based on false arrest or false imprisonment, the plaintiff must establish that "the defendant deprived him or her of his or her liberty without consent and without legal justification." *See Scott,* 345 Md. at 29, 690 A.2d at 1003; *Montgomery Ward,* 339 Md. at 721, 664 A.2d at 926; *Ashton v. Brown,* 339 Md. 70, 119, 660 A.2d 447, 471 (1995); *Great Atlantic & Pacific Tea Co. v. Paul,* 256 Md. 643, 654, 261 A.2d 731, 738 (1970). The core issue under Appellants "False Arrest/Imprisonment" cause of action is whether Appellees had legal authority to facilitate the arrest of Mr. Okwa at the airport. To resolve this issue, we must examine Appellees' legal authority to make arrests in conjunction with the circumstances of Mr. Okwa's arrest. *See Great Atlantic & Pacific Tea Co. v. Paul,* 256 Md. at 655, 261 A.2d at 738 ("the test whether legal justification existed in a particular case has been judged by the principles applicable to the law of arrest"). Appellees, as members of the Maryland Transportation Authority Police Force, have all the powers granted to other police in this State when exercising police authority on airport property. *See* Maryland Code (1974, 1993 Repl.Vol., 1999 Supp.), Transportation Article, § 4–208(b). One of the many powers given to police officers in this State is the authority, under certain circumstances, to make arrests without an arrest warrant. The boundaries of this particular authority are defined in Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.), Article 27, § 594B. As Mr. Okwa was arrested for disorderly conduct, a misdemeanor, subsections (a) & (b) of the statute are applicable to the present case. These subsections provide:

(a) *Arrest for crime committed in presence of officer.*—A police officer may arrest without a warrant any person who commits, or attempts to commit, any felony or misdemeanor in the presence of, or within the view of, such officer.

(b) *Arrest for crime apparently committed in presence of officer.*—A police officer who has probable cause to believe that a felony or misdemeanor is being committed in the officer's presence or within the officer's view, may arrest without a warrant any person whom the officer may reasonably believe to have committed such offense.

In part III. B. of this opinion, we held that for the purposes of summary judgment a trier of fact reasonably could infer from the facts alleged by Appellants that Appellees did not have probable cause to arrest Mr. Okwa for disorderly conduct. One consequence of this conclusion is that, without probable cause, Appellees did not have legal authority to arrest Mr. Okwa pursuant to § 594B(b).

We now consider Appellees' legal authority to arrest Mr. Okwa under § 594B(a). As alluded to earlier, the question is not simply whether Mr. Okwa was committing the misdemeanor of disorderly conduct in the presence of Appellees. Our task is slightly more complex. In the procedural posture of this case, we must resolve as a matter of law whether a trier of fact looking at the facts in the light most favorable to Appellants could infer reasonably that Mr. Okwa was not committing disorderly conduct. *See* Md. Rule 2–501(e); *Green,* 355 Md. at 501, 735 A.2d at 1047; *Baltimore Gas and Elec. Co.,* 338 Md. at 43, 656 A.2d at 311; *Natural Design, Inc.,* 302 Md. at 62, 485 A.2d at 671. We answer this question in the affirmative.

Looking at the facts in the light most favorable to Appellants, they establish that Mr. Okwa raised his voice during his attempt to settle a facially valid mercantile dispute with an airline employee. The airline employees summoned Officers Potter and Harper to come to the ticket counter. The officers directed Mr. Okwa to leave the area. Admittedly, he did not collect his belongings immediately and withdraw when the officers directed him to do so, but, without more, this is not enough to support the conclusion that Mr. Okwa committed the crime of disorderly conduct in the presence of Officers Potter and Harper. *See Dennis,* 342 Md. at 203, 674 A.2d at 931. A measure of distinction exists between acceptable as-

sertiveness and disorderly conduct. We think Appellants are entitled to have a fact-finder resolve this distinction.[13]

## IV. CONSTITUTIONAL CLAIMS

### A.

As an initial matter, before discussing the substance of the Circuit Court's findings regarding Appellants' counts brought under 42 U.S.C. § 1983,[14] we must dispose of a procedural question raised by Appellees. Appellees contend that the § 1983 count was dismissed properly by the trial court because Appellants incorrectly brought that count against the officers "in their official capacity." Appellees point out that § 1983 actions may only be charged against a "person" and that a state police officer sued in his or her official capacity is not a "person" as that term has been interpreted in the federal statute. Thus, Appellees conclude that the § 1983 claim cannot be maintained. Appellees' fundamental legal propositions are correct, but they misapply those principles to the allegations of the amended complaint in the present case.

Section 1983 permits a plaintiff to recover damages when an individual, acting under the color of state law, transgresses a federally created right of the plaintiff. *See Howlett By and Through Howlett v. Rose*, 496 U.S. 356, 358, 110 S.Ct. 2430, 2433, 110 L.Ed.2d 332, 342 (1990).[15] The text of the statute and cases analyzing § 1983 actions dictate that a defendant in a § 1983 action must be a "person." *See Ashton*,

---

13. *See* note 12.

14. All subsequent references to 42 U.S.C. § 1983 shall appear as § 1983.

15. Section 1983 provides, in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

339 Md. at 110, 660 A.2d at 466; *Ritchie v. Donnelly*, 324 Md. 344, 354, 597 A.2d 432, 437 (1991)(and cases cited therein). A state public official, sued in his or her official capacity, is not considered a "person" when a plaintiff brings a § 1983 action for monetary damages.[16] The purpose behind placing state officials sued in their official capacities out of range of a § 1983 claim is that such a suit, in essence, is a suit against the state, which is not a permissible defendant in a § 1983 action. *See Howlett By and Through Howlett*, 496 U.S. at 365, 110 S.Ct. at 2437, 110 L.Ed.2d at 346. If the plaintiff prevails, the state treasury, not the state official personally, will be responsible for paying the assessed damages. *See DiPino*, 354 Md. at 46, 729 A.2d at 369; *Ritchie*, 324 Md. at 359–60, 597 A.2d at 439. In *Ritchie*, we explained why state officials cannot be sued in their official capacity as follows:

"[o]bviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the state itself. . . . We see no reason to adopt a different rule in the present context, particularly when such a rule would allow petitioner to circumvent congressional intent by a mere pleading device."

*Ritchie*, 324 Md. at 355, 597 A.2d at 437 (quoting *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45, 58 (1989)).

State officials, however, may be sued in their individual or personal capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, 121 (1985); *DiPino*, 354 Md. at 46, 729 A.2d at 369; *Ashton*, 339 Md. at 111, 660 A.2d at 467. To establish personal liability upon a state official, a plaintiff must show that the official, while

---

**16.** An action for injunctive relief brought pursuant to § 1983 may be maintained against a state official or state employee regardless of which capacity the state official or employees is sued. *See Ritchie*, 324 Md. at 356, 597 A.2d at 437 (citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2311, n. 10, 105 L.Ed.2d 45, 58, n. 10 (1989)).

acting under the color of state law, caused the deprivation of a federally recognized right. *See Kentucky v. Graham,* 473 U.S. at 166, 105 S.Ct. at 3105, 87 L.Ed.2d at 122.

We find no merit in Appellees' argument on this issue. As stated above, to satisfy the pleading requirements of a § 1983 action, Appellants are required to allege that Appellees acted under the color of state law: *See Kentucky v. Graham,* 473 U.S. at 165, 105 S.Ct. at 3105, 87 L.Ed.2d at 121. Appellants attempt to satisfy at least the pleading requirement is represented, in part, by their allegations that "defendants, Harper, Potter and Gernert, acting in their capacities as police officers" were investigating the dispute between Mr. Okwa and airline personnel and that "[a]ll actions taken and performed by the defendants, Harper, Potter and Gernert, . . . were done by the defendants . . . as agents, servants, and/or employees of the State of Maryland." Appellees' suggestion that these excerpts somehow do double duty to transform Appellants' § 1983 claim into one brought against the Appellees in their official capacity is completely unfounded.

Moreover, Appellees' argument oversimplifies and misinterprets Appellants' allegations in this case. The statements, taken from the amended complaint, do not convince us that Appellants brought suit against Appellees in their official capacity. We have stated in the past that "a § 1983 action against a government officer does not become an official capacity action simply because of the labels used by the parties." *Ritchie,* 324 Md. at 361, 597 A.2d at 440. A reviewing court must look to the substance of the allegations and the progression of the claim to determine the precise nature of the action. *See generally DiPino,* 354 Md. at 47, 729 A.2d at 369. If from either the factual bases of the plaintiff's § 1983 claim or from the evidence offered by the plaintiff, it appears that the defendant is alleged to have implemented a formal policy or custom of the state, then the action may be classified as an official capacity action. *See id.* Stated differently, when the state is the "moving force" behind the defendant's alleged conduct, the claim is one brought against the

state official in their official capacity. *See Kentucky v. Graham,* 473 U.S. at 166, 105 S.Ct. at 3105, 87 L.Ed.2d at 122. When it appears, however, from the pleadings and the evidence offered, that the defendant is alleged to have acted on his own initiative and not in conformity with state policy, the claim should be deemed independent in nature. *See DiPino,* 354 Md. at 47, 729 A.2d at 369. *Cf. Ashton,* 339 Md. at 112, 660 A.2d at 468, (citing *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991))("a state official, who was not a § 1983 "person" in her official capacity, could nonetheless be sued under § 1983 in her individual capacity on the basis of her official acts").

This approach comports with the majority of federal courts that have considered the question of whether a § 1983 action is one charged against defendants in their official or individual capacities. In *Biggs v. Meadows,* 66 F.3d 56 (4th Cir.1995), the complaint did not state whether a § 1983 claim brought against North Carolina state prison officials was filed against them in their official or individual capacities. The trial court granted the defendant's motion to dismiss based on the presumption that § 1983 defendants are sued in their official capacity unless the complaint states explicitly that the claim was brought against the defendants individually. *See Biggs,* 66 F.3d at 59–60.

The United States Court of Appeals rejected the presumption applied by the trial court. Instead, the Court held that the better reasoned approach, as well as the majority view, was to examine the substance of the proceedings, rather than focus exclusively on the form of the pleading, to determine the nature of the action. *See id.* at 59. The Court stated:

when a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity. One factor indicating that suit has been filed in such a manner might be the plaintiff's failure to allege that the defendant acted in accordance with a governmental policy or custom, or the lack of indicia of such a policy or custom on

the face of the complaint. Another indication that suit has been brought against a state actor personally may be a plaintiff's request for compensatory or punitive damages, since such relief is unavailable in official capacity suits. The nature of any defenses raised in response to the complaint is an additional relevant factor. Because qualified immunity is available only in a personal capacity suit, the assertion of that defense indicates that the defendant interpreted the plaintiff's action as being against him personally. Throughout, the underlying inquiry remains whether the plaintiff's intention to hold a defendant personally liable can be ascertained fairly.

*Id.* at 61 (citations omitted). *See also Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993); *Price v. Akaka,* 928 F.2d 824, 828 (9th Cir.1990); *Conner v. Reinhard,* 847 F.2d 384, 394 (7th Cir.1988).

Utilizing this reasoning, we first shall consider the substance of the allegations in Appellants' § 1983 count. They assert that through Appellees' "conduct and egregious actions, and their use of unnecessary and excessive force in effectuating his unlawful arrest," Mr. Okwa was stripped of his civil rights. More specifically, Mr. Okwa states in his affidavit, "I was forcibly put to the ground, and either Gernert or Harper struck me in the head and neck, and Potter twisted my thumbs." Appellants do not attribute specifically these actions to Appellees in their individual capacity, but neither party contends, understandably so, that such use of force to make an arrest is a standard custom or practice advanced by the State of Maryland or the Maryland Transportation Authority. The substance of these allegations clearly focuses on the independent activities of Appellees as they arrested Mr. Okwa.

As we explained earlier, the form and labels employed by the parties in respectively instituting and defending a § 1983 action generally may not be used as the sole determinative factor in classifying the nature of a § 1983 action. *See DiPino,* 354 Md. at 47, 729 A.2d at 369; *Ritchie,* 324 Md. at

361, 597 A.2d at 440. These factors, however, may provide further guidance as to the intentions of the parties in litigating the action. Looking to the form of Appellants' § 1983 claim and Appellees' defenses, we are further persuaded that the claim should be treated as an individual capacity action. In Appellants' amended complaint, they seek punitive damages for the § 1983 violations in the amount of $20,000,000. Because punitive damages are not available in an official capacity action, Appellants' requests for such damages support an inference that they intended to sue Appellees in their individual capacity. *See DiPino,* 354 Md. at 47, 729 A.2d at 369.

 Throughout the course of these proceedings, Appellees have claimed that they are entitled to qualified immunity. Qualified immunity may only be asserted as a defense to an individual capacity suit. *See DiPino,* 354 Md. at 47, 729 A.2d at 369 *See also Kentucky v. Graham,* 473 U.S. at 166–67, 105 S.Ct. at 3105, 87 L.Ed.2d at 122. Appellees assertion of this immunity signals to us that they contemplated, at least alternatively, that they were sued as individuals. Thus, they will not be prejudiced unfairly by our view that the § 1983 count is an individual capacity claim. *See Biggs,* 66 F.3d at 61. In sum, the substance of the § 1983 claim in this case demonstrates that Appellants sued Appellees as individuals.

 We now address the Circuit Court's grant of summary judgment regarding Appellants' § 1983 counts. The Circuit Court granted summary judgment because, in its view, Appellees "enjoy the privilege of immunity and did not act ~~not act~~ with malice to lift the bar of such immunity." The Court further concluded that Appellants failed "to allege facts sufficient to lift the bar of immunity in that they have not proved that [they] were deprived of a right or privilege secured by the Constitution." The Court erred in two respects. The Circuit Court first erred by relying on its finding that Appellees "did not act with malice" as a ground for finding them immune from the § 1983 count. Immunity from a § 1983 claim, as well as all the other complex and confusing facets of § 1983 actions, is governed by federal law. *See Howlett By*

*and Through Howlett,* 496 U.S. at 375, 110 S.Ct. at 2442, 110 L.Ed.2d at 353; *DiPino,* 354 Md. at 46, 729 A.2d at 369; *Ritchie,* 324 Md. at 353, 597 A.2d at 436. Qualified immunity from § 1983 claims is provided to government officials as a result of a balancing of competing interests. The need to provide a legal means to vindicate a citizen's federally recognized rights when they are transgressed by government actors is measured against the costs of necessarily inhibiting government officials in the discharge of their occupational duties, including the time spent defending unfounded claims. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523, 529–30 (1987). In developing the test for qualified immunity under a § 1983 action, the Supreme Court disposed of the previously recognized subjective element of the defense. The Court determined that requiring government officials to establish a lack of malice was too lofty of a burden to meet at the summary judgment phase of litigation and, therefore, incompatible with the Court's desire to dispose of unsubstantiated claims early in the gestation of a case. *See Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982); *Shoemaker v. Smith,* 353 Md. at 158–60, 725 A.2d at 557–58 (discussing the Supreme Court's abrogation of the subjective element for qualified immunity under § 1983 claims). Under the recognized test for qualified immunity, the subjective intentions of a government official play no role in the analysis and the Circuit Court erred in factoring malice into the § 1983 immunity equation. *See Shoemaker,* 353 Md. at 159, 725 A.2d at 558.

Justice Scalia, writing for the Court in *Anderson,* summarized the analysis to be undertaken in ascertaining whether a government actor is immune from a § 1983 claim. He stated:

[o]ur cases have ... provid[ed] government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly

unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken.

*Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038, 97 L.Ed.2d at 530 (citations omitted). *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410 ("government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). *See also Kentucky v. Graham,* 473 U.S. at 166–67, 105 S.Ct. at 3105, 87 L.Ed.2d at 122; *Slattery v. Rizzo,* 939 F.2d 213, 215 (4th Cir.1991); *Ashton,* 339 Md. at 111, 660 A.2d at 467.

■ The second error committed by the Circuit Court was concluding, as a matter of law at the summary judgment stage, that Appellees possess qualified immunity from Appellants' § 1983 cause of action. In determining whether Appellees were entitled to qualified immunity from Appellants' § 1983 claim we first look to the relevant "legal rules that were 'clearly established' at the time" which governed Appellees actions during the arrest. *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038, 97 L.Ed.2d at 530. *See Slattery,* 939 F.2d at 216. Appellants allege that Appellees used excessive force in arresting Mr. Okwa, so our inquiry focuses on a police officer's right to use force when facilitating an arrest.

■ The Supreme Court has long recognized the right of police officers to take necessary measures and use some degree of force when arresting a suspected defendant. *See Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443, 455 (1989)(citing *Terry v. Ohio,* 392 U.S. 1, 22–27, 88 S.Ct. 1868, 1880–83, 20 L.Ed.2d 889, 906–09 (1968)). This right to use a certain degree of force must be carefully analyzed in light of "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting

arrest." *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455. *See also Slattery*, 939 F.2d at 216. In *Graham v. Connor*, the Court explained the proper perspective from which we must view a police officer's use of force:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight .... [w]ith respect to a claim of excessive force, the same standard of reasonableness at the moment applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham v. Connor*, 490 U.S. at 396–97, 109 S.Ct. at 1872, 104 L.Ed.2d at 455–56. *See also Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir.1996).

▇▇▇ Keeping this perspective in mind, we consider the record before the Circuit Court to assess whether Appellees' use of force was reasonable at the time they arrested and detained Mr. Okwa. Viewing the facts before the trial court in the light most favorable to Appellants, it is plainly evident that the Circuit Court erred in finding Appellees immune from the § 1983 cause of action.

Mr. Okwa stated in his affidavit that after he was dragged out of the airport terminal he was forcibly put to the ground and struck in the head and neck by either Officer Harper or Gernert. While on the ground, Officer Potter twisted his cuffed hands by his thumbs. Mr. Okwa insisted that during the entire incident he did not resist or provoke Appellees so as to justify such action. He was an unarmed man in a relatively sparsely populated part of an airport terminal that was confronted and restrained by three, and later more, officers. Under the facts as alleged by Appellants, Mr. Okwa posed no

apparent danger to the officers or the public. For purposes of summary judgment, Appellees were not entitled, as a matter of law, to qualified immunity for their use of force against Mr. Okwa.

### B.

With respect to Appellants' claim brought under Article 24 of Maryland's Declaration of Rights, the Circuit Court also granted Appellees summary judgment. The Court found that Appellees arrested and detained Mr. Okwa in accordance with the Maryland Constitution. Although our legal analysis for Appellants' Maryland Constitutional claim differs somewhat from our analysis of their claims brought under the federal constitution through § 1983, we reach the same conclusion. The Circuit Court erred in granting summary judgment to Appellees.

This Court has recognized that a common law action for damages lies when an individual is deprived of his or her liberty in violation of the Maryland Constitution. *See DiPino,* 354 Md. at 50, 729 A.2d at 371; *Ashton,* 339 Md. at 101, 660 A.2d at 462; *Ritchie,* 324 Md. at 369, 597 A.2d at 444; *Widgeon v. Eastern Shore Hosp. Center,* 300 Md. 520, 537–38, 479 A.2d 921, 930 (1984)(answering affirmatively federal question inquiry regarding the existence of an action for damages for violations of Articles 24 and 26 of Maryland's Declaration of Rights). At the onset we note some of the features that distinguish an action for damages brought for violations of Article 24 from one brought under § 1983. A state public official alleged to have violated Article 24, or any article of the Maryland Declaration of Rights, is not entitled to qualified immunity. *See Ritchie,* 324 Md. at 373, 597 A.2d at 446; *Clea v. Mayor and City Council of Baltimore,* 312 Md. 662, 684–85, 541 A.2d 1303, 1314 (1988). In *Clea,* we explained:

> constitutional provisions like Articles 24 or 26 of the Maryland Declaration of Rights, or Article III, § 40, of the Maryland Constitution, are specifically designed to protect citizens against certain types of unlawful acts by govern-

ment officials. To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the purpose of the constitutional provisions.

312 Md. at 684–85, 541 A.2d at 1314. In addition, for violations of the Maryland Constitution, we do not follow the federally recognized distinction between official and individual capacity actions. *See Ritchie,* 324 Md. at 370, 597 A.2d at 445. This Court has imposed liability on state officials for violating an individual's Maryland Constitutional rights when the official has acted in furtherance of a state policy and custom, as well as for actions taken on his own initiative. *See id.* In part III. C. of this opinion, we concluded that, for the purpose of summary judgment, Appellees did not have legal authority to arrest Mr. Okwa for disorderly conduct. On this basis alone, we similarly conclude that summary judgment was granted improperly on Appellants' Article 24 claims because an arrest without legal authority qualifies as "an unlawful act by a government official." *Clea,* 312 Md. at 684–85, 541 A.2d at 1314.

Our analysis would normally end at this point, however, because the parties, in their briefs, elected to take a different route around this issue, we shall offer a responsive analysis for guidance on remand. The parties argue that, because Appellants' Article 24 claims are essentially excessive force claims implicating similar rights protected by the Fourteenth Amendment to the United States Constitution, we should resolve the issue using federal jurisprudence. In prior cases, when a right protected under Maryland's Constitution is also secured under a companion provision of the U.S. Constitution, Maryland courts often have looked to federal cases interpreting the parallel federal provision. *See Kirsch v. Prince George's County,* 331 Md. 89, 97–98, 626 A.2d 372, 376 (1993)(resolving a claim brought under Article 24 of the Declaration of Rights using federal cases decided under the Fourteenth Amendment to the U.S. Constitution); *Murphy v. Edmonds,* 325 Md. 342, 354, 601 A.2d 102, 108 (1992)("United States Supreme Court opinions concerning the Equal Protection Clause of the Four-

teenth Amendment 'are practically direct authorities' with regard to Article 24 of the Declaration of Rights"); *Hargrove v. Maryland Retirement System,* 310 Md. 406, 416, 529 A.2d 1372, 1377 (1987)("Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment's Equal Protection Clause . . . generally mean the same and apply in like manner"); *Lodowski v. State,* 307 Md. 233, 247, 513 A.2d 299, 307 (1986)("we adhere to the construction the Supreme Court has placed on the like provision of the Sixth Amendment" to interpret that right under Article 21 of Maryland's Declaration of Rights); *Williams v. Prince George's County,* 112 Md.App. 526, 547, 685 A.2d 884, 895 (1996)("the essential analysis . . . is the same under Articles 24 and 26 of the Maryland Constitution as that under the Fourth Amendment to the United States Constitution").

Article 24 of the Maryland's Declaration of Rights provides:

> [t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

The Maryland Constitution does not contain an express equal protection clause, but we nonetheless have held that the principles of equal protection are impliedly guaranteed through Article 24. *See Kirsch,* 331 Md. at 96, 626 A.2d at 375; *Murphy,* 325 Md. at 353, 601 A.2d at 107. *See also In re Easton,* 214 Md. 176, 187, 133 A.2d 441, 447 (1957). Because, as the parties point out, Article 24 is Maryland's analogue to the Fourteenth Amendment of the United States Constitution we may look to federal opinions interpreting the Fourteenth Amendment for guidance when a citizen claims to have been subjected to unreasonable or arbitrary discrimination by a government official. *See Kirsch,* 331 Md. at 97, 626 A.2d at 376.

In Appellants' Article 24 count, they incorporate the allegations that Appellees used excessive force when they arrested

and detained Mr. Okwa and that their "conduct was character-
ized by race-based discrimination, an evil motive, ill will and
physical aggression demonstrating an intent to injure" Mr.
Okwa. To analyze those allegations we return to the jurispru-
dence of the Untied States Supreme Court.

In *Graham v. Connor,* the Court reviewed a claim brought
against North Carolina police officers alleging that the police
had used excessive force in making an investigatory stop in
violation of the plaintiff's rights secured to him under the
Fourteenth Amendment to the United States Constitution and
§ 1983. 490 U.S. at 390, 109 S.Ct. at 1868, 104 L.Ed.2d at
451. The Court first recognized that "all claims that law
enforcement officers have used excessive force—deadly or
not—in the course of an arrest, . . . should be analyzed under
the Fourth Amendment and its 'reasonableness' standard."
*Graham v. Connor,* 490 U.S. at 395, 109 S.Ct. at 1871, 104
L.Ed.2d at 454. As stated *supra,* to examine a police officer's
use of force we take the perspective of a reasonable officer on
the scene of the incident at issue and pay close attention to the
particular facts of each case. *See Graham v. Connor,* 490 U.S.
at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455. We consider
whether the plaintiff posed an immediate danger to the public
or the police and whether the plaintiff was resisting arrest,
taking into account that due to the exigency of some circum-
stances, police officers may be forced to make split second
decisions based on incomplete facts. *See Graham v. Connor,*
490 U.S. at 396–97, 109 S.Ct. at 1872, 104 L.Ed.2d at 455–56.
Similar to our holding in part IV. A. of this opinion, that
viewing the facts before the Circuit Court, Appellees use of
force in arresting and detaining Mr. Okwa could be viewed as
unreasonable if Mr. Okwa's allegations were assumed as prov-
en and credited by a fact-finder, the Circuit Court's grant of
summary judgment on the Article 24 count was improper.

## V.

The Circuit Court dismissed Appellants' loss of consortium
counts because the claims were dependent on Appellants'
substantive causes of action, on which the Court granted

summary judgment to Appellees. Because we hold that the Circuit Court erred in granting summary judgment on the counts addressed *supra*, we concomitantly conclude that the Court erred in dismissing the loss of consortium counts.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, AS TO MICHAEL G. HARPER, KIMBERLY POTTER, AND WILLIAM H. GERNERT, REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEES.**